UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SPRINTCOM, INC., WIRELESSCO, L.P., | ) | |
| NPCR, INC., d/b/a NEXTEL PARTNERS, | ) | |
| and NEXTEL WEST CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13 C 06565 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DOUG SCOTT, JOHN T. COLGAN, | ) | |
| ANN McCABE, MIGUEL del VALLE, | ) | |
| and SHERINA E. MAYE, in their official | ) | |
| capacities as Commissioners of the Illinois | ) | |
| Commerce Commission, and ILLINOIS BELL | ) | |
| TELEPHONE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs SprintCom, Inc. and affiliated entities (collectively referred to as Sprint) bring this action under the Telecommunications Act, 47 U.S.C. §§ 151 *et seq.*[1] Sprint appeals from a decision of the Illinois Commerce Commission (ICC) setting the terms of an agreement between Sprint and Illinois Bell Telephone Company (which is part of AT&T) over access to local telecommunications networks. Sprint requests that the Court declare some provisions in the agreement unlawful, enjoin their enforcement, and compel the ICC to reconsider its determinations about other terms that purportedly misapplied federal law. For the reasons discussed

---

[1]The Court exercises subject-matter jurisdiction under 47 U.S.C. § 252(e)(6).

below, the ICC's orders are affirmed and Sprint's requests for declaratory and injunctive relief denied.

## I. Background

### A. Regulatory Framework and Procedural History

Congress passed the Telecommunications Act in 1996 in order to "promote competition in the previously monopoly-driven local telephone service market" by requiring existing local telephone service providers (sometimes called ILECs, for incumbent local exchange carriers) to allow new entrants (or CLECs, competitive local exchange carriers) to use the incumbents' existing infrastructure. *Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 382 (7th Cir. 2004) (citing *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 475-76 (2002)). Under the Act, incumbents must allow "interconnection" between competitors and the incumbents' networks, enabling "the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A). Congress recognized that without this obligation, "the incumbents would maintain a stranglehold on local telephone service: no new entrant could realistically afford to build from the ground up the massive communications grid the incumbents had developed through years of monopolistic advantage." *McCarty*, 362 F.3d at 382.

To that end, the Act provides that incumbents must negotiate with competitors to arrive at interconnection agreements that govern the details of this shared use, such as pricing and types of permissible network traffic. 47 U.S.C. § 252(a); *see Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 568-69 (7th Cir.

2

1999). Issues that are not resolved by initial negotiation may be referred for arbitration to the relevant state commission, which must ensure that all final agreements (whether they involved arbitration or not) are consistent with the Act and with regulations issued by the Federal Communications Commission (FCC). 47 U.S.C. §§ 252(b)(1), (c). A party that believes that a state commission has failed to do so may seek review in federal district court. 47 U.S.C. § 252(e)(6).

Sprint is a FCC-authorized wireless service provider in Illinois, where it now competes with AT&T, the former monopolist-incumbent. R. 1, Compl. ¶¶ 5, 8; R. 26, AT&T Answer ¶ 7. In April 2012, Sprint and AT&T opened negotiations on an interconnection agreement but were unable to resolve a number of issues. Compl. ¶ 14. Sprint petitioned in October 2012 for a panel of ICC administrative law judges to arbitrate the matter. R. 1-1 ICC Arbitration Decision at 1-2. The ICC issued a final arbitration decision on June 26, 2013, *id.*, and the parties produced an interconnection agreement consistent with the ICC's determinations, R. 36-1, Final Interconn. Agreement. The ICC approved this final agreement by order dated August 14, 2013. R. 1-3, ICC Approval Order.

Sprint then brought the present complaint seeking declaratory and injunctive relief on five counts where it believed the ICC erred as a matter of law, resulting in a legally flawed agreement. Compl., Prayer for Relief. Two of the counts having been since voluntarily dismissed, the three remaining at issue are summarized below. R. 54, 60, Stips. Dismissal (dismissing Counts IV and V with prejudice).

## B. Challenged ICC Determinations

Count One of the complaint concerns whether AT&T, as an incumbent, was obligated to provide interconnection to Sprint at lower, cost-based rates known as TELRIC (or Total Element Long Run Incremental Cost) for calls that Sprint sought to route through AT&T's network but actually originated from an "end-user" on a third-party long-distance carrier, or interexchange carrier (also referred to as an IXC). Compl. ¶¶ 20, 22. Resolution of this issue affected Sprint's ability to use the interconnection facilities (comprised of call-routing hardware, such as switches) that enable the calls to be physically sent through AT&T's networks at cost-based rates, as well as Sprint's access to preferable "transit" rates for the calls overall. *Id.* ¶ 22.

On the question of pricing for use of the facilities, the ICC found that cost-based rates could only be available to Sprint under the Act for interconnected calls made uniquely for non-interexchange-carrier traffic. Arbitration Decision at 16. The ICC concluded that AT&T was not obligated under the Act to provide transit rates for calls involving such third-party carriers, but found that the applicable rates AT&T had in place for these calls had been, in any event, originally cost-based. *Id.* at 45. Because those rates were already a decade old at that point, however, the ICC ordered that AT&T conduct an investigation into whether these rates required updating, and allowed AT&T to charge its current (cost-based, though possibly outdated) rates in the interim.[2] *Id.*

---

[2]AT&T initially filed but later voluntarily dismissed a counterclaim/crossclaim seeking review of the ICC's order compelling the study as contrary to state law. R. 26, AT&T Answer and Counterclaim/Crossclaim; R. 61, Stip. Dismissal. That dismissal mooted

As its second count, Sprint raises a related issue about interconnection facilities, namely whether Sprint must route *only* interconnection traffic through AT&T's network switches in order to preserve cost-based rates. Compl. ¶ 27. Sprint argued that it may use the facilities to carry some *non*-interconnection traffic, that is, interexchange carrier traffic, and yet still pay the cost-based rates; the ICC disagreed and sided with AT&T to find that the use of any non-interconnection traffic alongside the interconnection-related calls results in Sprint's loss of the preferable rates. Arbitration Decision at 19. As a result, Sprint believes that the ICC incorrectly resolved several provisions in the agreement, resulting in less favorable language on pricing, and forcing Sprint to unnecessarily establish separate facilities for certain calls. Compl. ¶ 29. Sprint seeks an order compelling the ICC to reconsider its resolution of these provisions. *Id.* ¶ 33.

The third and final issue centers on whether AT&T may levy "access charges" against Sprint for certain calls identified by the FCC as "exchange access" traffic.[3] Compl. ¶¶ 36-38. The ICC rejected Sprint's argument that federal law only authorized access charges on calls that were subject to a separate toll charge, which was not the case for the traffic Sprint sought to protect in this case. Arbitration Decision at 62. Instead, the ICC determined that the sole, controlling factor was

AT&T's motion for expedited decision by the Court [R. 27] on the question of federal jurisdiction over its appeal.

[3]Sprint's voluntarily dismissed fourth and fifth counts concerned disputes over certain interim rates charged by AT&T and the required use of Internet protocol, or IP, capable equipment in exchanging call traffic. Compl. ¶¶ 45, 53. Two interested telecommunications providers, Verizon and tw telecom of illinois, submitted briefs as *amici curiae* addressing Sprint's now-withdrawn Count Five. R. 48-1, Verizon Br.; R. 56-1, tw telecom Br.

where the call originated and ended, meaning that any interregional calls made between so-called Major Trading Areas could be made subject to access charges. *Id.*

## II. Standard of Review

Under the unusual regulatory framework set up by the Act, the Court here reviews the actions of a state agency in implementing a federal statute. *See Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 571 (7th Cir. 1999), as amended (Aug. 19, 1999); *see also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6, 385 n.10 (1999) (acknowledging that federal government has taken over telecommunications regulation but calling discretionary role left to 50 state commissions a "decidedly novel" scheme). "[T]he district court's sole responsibility is to determine whether the interconnection agreement meets the requirements of sections 251 and 252 of the Act." *McCarty*, 362 F.3d at 383. In this regard, review of the state commission's interpretations of federal law is *de novo. Id.* at 385. Review of the commission's determinations of fact and mixed questions of law and fact, by contrast, proceeds under a more deferential "arbitrary and capricious" standard. *Ill. Bell Tel. Co. v. Box*, No. 06 C 3550, 2007 WL 2815924, at *4 (N.D. Ill. Sept. 21, 2007) (citation omitted), *aff'd*, 526 F.3d 1069 (7th Cir. 2008).

## III. Discussion

### A. Count One: Lease Rates for Interconnection Facilities

Sprint objects to the ICC's determination that cost-based TELRIC rates can only be applied to interconnected calls between an end-user of Sprint (on one end) and an end-user of AT&T (on the other), contending that § 251 of the Act does not

support such a limitation. R. 36, Sprint Br. at 6-7. There is no doubt that *direct* interconnection between Sprint and AT&T (calls that begin with a user of one and end with one of the other) is subject to cost-based rates. 47 U.S.C. § 251(c)(2); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2264-65 (2011) (deferring to FCC view that incumbents must make transmission facilities available to competitors at cost-based rates). But Sprint argues that, in addition, the language of the Act allows cost-based pricing for *indirect* interconnection traffic that uses AT&T's network but features a Sprint user only on one end and a third-party interexchange carrier on the other. Sprint Br. at 6.

To begin, the ICC's determination about what overall rates should apply to the interconnection traffic in question (that is, the price paid for transporting and completing the call) does not appear to raise an actual question of law requiring resolution. Based on its review of the record, the ICC found that the rates AT&T was charging for transit calls (those involving a third-party end-user) were in *fact* originally cost-based, regardless of whether as a matter of *law* the charges must be cost-based. Arbitration Decision at 45. The ICC noted a *factual* question about whether those rates, which were first set over ten years before it issued its arbitration decision, remained up to date and accordingly ordered an investigation into that question. *Id.* In other words, the ICC agreed in effect (at least in this case) with Sprint's position on how the rates should be set and ordered further steps to ensure that those rates factually reflected cost-based prices. The Court defers to the ICC's fact-finding in this regard, which is not (nor alleged to be) arbitrary and

capricious. *Box*, 2007 WL 2815924, at *4. Moreover, although Sprint initially challenged the ICC's imposition of an interim transit charge while the investigation proceeded, Sprint withdrew that count from its complaint. Compl. ¶¶ 44-51; Stip. Dismissal.

What *is* in dispute is whether the Act compelled the ICC to order AT&T to provide cost-based rates for the use of the facilities involved in interconnection of certain indirect traffic. *See generally Pac. Bell Tel. Co. v. Cal. Pub. Utils. Comm'n*, 621 F.3d 836, 842 (9th Cir. 2010) (explaining the role of entrance facilities in interconnection). Sprint argues that cost-based access to facilities must be made without limitation to who the end-users are because § 251 provides that all telecommunications providers have the duty to "interconnect directly or *indirectly*." Sprint Br. at 6 (citing 47 U.S.C. § 251(a)). In support of its position, Sprint relies on a recent decision by the Second Circuit, affirming that "carriers have the right to interconnect to exchange traffic that does not originate or terminate on their own networks." *S. New England Tel. Co. v. Comcast Phone of Conn., Inc.*, 718 F.3d 53, 63 (2d Cir. 2013) ("*SNET*") (citing FCC Opinion and Order, 22 F.C.C.R. 3513 (2007)). Emphasizing that "nothing in the language of § 251 suggests that the interconnection duty relates only to the transmission and routing of traffic between a [competitor's] and the [incumbent's] end-users," the Second Circuit explained that given the pro-competition goals of the Act and the importance of third-party transit traffic, indirect interconnection was just as essential. *Id.* at 63; *accord Qwest Corp. v. Cox Neb. Telcom, LLC*, No. 08 CV 3035, 2008 WL 5273687, at *3 (D. Neb. Dec. 17,

2008) ("The clear language of Section 251 requires [incumbents] to directly interconnect with competitors and facilitate competitors' ability to indirectly interconnect.").

An important detail about this analysis, however, is that it concerns indirect interconnection involving competitors only—that is, where a competitor (in this case Sprint) transits a call through an incumbent (such as AT&T) in order to reach another *competitor* in the same exchange area. *See, e.g.*, *Ill. Bell Tel. Co. v. Box*, 526 F.3d 1069, 1071 (7th Cir. 2008) (describing traffic "from the customers of one [competitor] to the customers of another, using the [incumbent's] circuits as intermediaries"). For its part, AT&T does not appear to contest that this type of indirect traffic is TELRIC-eligible; rather, AT&T argues that it is still consistent with FCC rules to deny Sprint access to interconnection facilities at cost-based rates where they would be used to exchange traffic with an interexchange carrier, which is a long-distance carrier operating *outside* the exchange area. AT&T Resp. Br. at 4-5.[4] Sprint contends that the logic of *SNET* extends to any situation in which the incumbent is the middleman, whether that incumbent is interconnecting traffic from a competitor to a competitor, or from a competitor to an interexchange carrier, and vice versa. R. 62, Sprint Reply Br. at 2-3.

The Court disagrees. Based on the statutory language of the Act and supporting regulations, a state commission may properly draw a distinction between the local traffic of interconnection of competitor-bound calls and the long-

---

[4]The ICC adopted the arguments of AT&T's brief as to the remaining issues, addressing separately in its brief only the two counts that were subsequently dismissed. R. 49, ICC Resp. Br. at 7.

distance traffic of interexchange-carrier-bound ones. *See Talk Am., Inc.*, 131 S. Ct. at 2265 n.6 ("Interconnection arrangements may be used for local telephone service but not for long-distance services.") (citing 47 C.F.R. § 51.305(b)). Section 251(c)(2) mandates that incumbents must provide interconnection "for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A). "Telephone exchange service" is defined as "service *within* a telephone exchange, or within a connected system of telephone exchanges *within* the same exchange area," and exchange access as the "offering of access" thereto. 47 U.S.C. §§ 153(20), (54) (emphases added). Thus, the interconnection duty as articulated by the Act applies only in the context of local traffic *within* exchange areas, as distinct from interexchange traffic.

What's more, while § 251(c)(2) outlines incumbents' interconnection obligations vis-à-vis local-exchange competitors, a separate provision, § 251(g), specifically addresses interconnection requirements to allow access by interexchange carriers. In contrast to competitive-local-exchange-related obligations, it provides that each incumbent "shall provide exchange access, information access, and exchange services for such access to interexchange carriers with the same ... restrictions and obligations [as in effect prior to the Act]." 47 U.S.C. § 251(g). The Eighth Circuit relied on this statutory distinction to conclude that the Act authorized regulation of local and long-distance interconnection, including its physical facilities, to be premised on different approaches, and the court thus rejected a challenge to a state regulation that had the effect of permitting

an incumbent to charge different facility access rates based on whether the interconnection sought was to facilitate long-distance or local traffic. *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068, 1072-73 (8th Cir. 1997).

In sum, the Act embraces the option of distinct regulatory outcomes for the two types of traffic. *See generally Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 98 (2d Cir. 2006) (noting that statutory regime draws "sharp distinctions between services known popularly as 'local' and 'long-distance'"). To be sure, the FCC and state commissions could choose to regulate the facility costs of both in the same manner. *See Competitive Telecomms.*, 117 F.3d at 1073 (noting that § 251(g) "leaves the door open for the promulgation of new rates" and possibility of "same cost-based restrictions" as with other interconnection). But nothing in the Act *compels* that treatment of competitor-interconnection under § 251(c)(2) in one manner must automatically mean the same result for interexchange-interconnection under § 251(g). The logic of *SNET* cannot simply be extended to apply cost-based leasing of facilities to interexchange traffic, as Sprint suggests, as part of a broad "end-user neutral" rule, where the Illinois Commerce Commission has explicitly declined to adopt it.

As the Second Circuit has observed, state commissions have regulated this area in different ways as part of the "state experimentation with interconnection obligations" envisioned by Congress when it passed the Act. *SNET*, 718 F.3d at 58 (citing *In the Matter of Connect Am. Fund, A Nat'l Broadband Plan for Our Future et al., Report and Order and Further Notice of Proposed Rule-Making*, 26 F.C.C.R.

11

17663, 18114 (2011)). The ICC acted in a manner consistent with this free hand as provided for by the Act and there is accordingly no basis to find that the ICC erred as a matter of law in drawing the distinction that it did.

**B. Count Two: Permissible Traffic**

A related question is whether the leased facilities must be used exclusively for eligible interconnection traffic in order to preserve cost-based-pricing. The ICC found that AT&T was not obligated to provide cost-based rates if Sprint sought to include any interexchange-traffic, stating that "Interconnection Facilities are only available at TELRIC prices when they are used exclusively for Section 251(c)(2) Interconnection." Arbitration Decision at 19. As explained next, there is no basis to overturn that determination.

In 2005, the FCC adopted a regulation that did away with a requirement that incumbent carriers had to make interconnection facilities available for lease on an "unbundled" basis to competitors at cost-based rates. *See* 47 C.F.R. § 51.319(e)(2)(i). "Unbundled" leasing means "giving separate prices for equipment and supporting services," on an à la carte basis, rather than as part of a larger, take-it-or-leave-it package. *McCarty*, 362 F.3d at 389; (quoting *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 394 (1999)). The FCC justified its decision by concluding that competitors would not be impaired by losing mandatory unbundled access. *In re Unbundled Access to Network Elements*, 20 FCC Rcd. 2533 ¶¶ 137-38 (2005). But the FCC made clear that the change did not "alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2)." *Id.* ¶ 140.

This action was an important one for purposes of resolving Sprint's present claim. Before the FCC did away with mandatory unbundled access, competitors would lease interconnection facilities under the unbundled access provision, because they "could be used for any purpose." *Talk Am., Inc.*, 131 S. Ct. at 2264. One such purpose in addition to interconnection was backhauling—the precise parameters of the term are subject to dispute, but generally it means the use of an intermediary network to transport traffic that is *not* ultimately meant for exchange just between the incumbent and competitor networks, including the kind of interexchange-bound calls Sprint seeks here to include. *See id.* at 2259 n.2. After the FCC eliminated mandatory unbundled access, competitors can still gain access to facilities at cost-based rates, but *only* under the § 251(c)(2) exception for interconnection purposes. *See Box*, 526 F.3d at 1071 (after the 2005 FCC order, local competitors "use entrance facilities exclusively for interconnection"). Thus, by arguing for an interpretation that would allow it to continue mixing in long-distance traffic too, Sprint appears to pursue a back-door way to preserve the pre-2005, all-use regime even though "the FCC effectively eliminated … unbundled access to entrance facilities for backhauling purposes." *Talk Am., Inc.*, 131 S. Ct. at 2265.

Sprint's efforts to argue otherwise are not persuasive. Sprint points to a FCC regulation stating that "[a] carrier that requests interconnection solely for the purpose of originating or terminating its interexchange traffic on an incumbent LEC's network and not for the purpose of providing to others telephone exchange service, exchange access service, or both, is not entitled to receive interconnection

13

pursuant to section 251(c)(2) of the Act." 47 C.F.R. § 51.305(b). Sprint argues that the words "or both" are key, demonstrating that the Act and FCC regulations do not require interconnection exclusivity; as long as the requesting carrier uses the facility for some telephone exchange service *or* exchange access traffic, non-§ 251(c)(2) traffic is supposedly allowed. Sprint Br. at 11. But that argument misapprehends the statutory meaning of these terms. As discussed above, "telephone exchange service" and "exchange access" refer to traffic "within the same exchange area," or local area. 47 U.S.C. §§ 153(20), (54). Because neither of these terms encompasses interexchange-carrier traffic, the text of this regulation does not support the contention that federal law must permit non-exclusive use of interconnection facilities.

Sprint further relies on a 2011 FCC order with language that appears to suggest that some interexchange traffic is permissible because § 251(c)(2) "does not preclude [a] carrier from relying on [interconnection] functionality to exchange other traffic with the [incumbent]." *In the Matter of Connect Am. Fund*, 26 F.C.C. Rcd. 17663, 18028 ¶ 972 (2011) (*CAF Order*). The problem with Sprint's reliance on that order is that the traffic in question there was specifically VoIP (voice-over-internet-protocol) traffic, which is a separate technology that transmits voice communications over broadband internet connections. *See Global NAPs Ill., Inc. v. Ill. Commerce Comm'n*, No. 09CV3113, 2010 WL 610606, at *2 n.2 (N.D. Ill. Feb. 18, 2010). Indeed, rather than imply that the use of VoIP over interconnection somehow frees up a carrier like Sprint to route-through traditional IXC-traffic as well, the

FCC acknowledged that this separate technology raises distinct issues of "associated compensation" within the context of interconnection arrangements. *CAF Order* ¶ 972. In other words, the order addresses an issue irrelevant to the one at hand.

Accordingly, the ICC did not violate federal law when it determined that cost-based TELRIC rates for leasing interconnection facilities apply only when used for §251(c)(2) interconnection traffic.

### C. Count Three: Access Charges

Sprint's final challenge is to the ICC's finding that AT&T was allowed to impose access charges on any interregional calls that Sprint routed through AT&T's network. Under the Act, local and long-distance calls transferred between carrier networks are subject to separate compensation arrangements. Locally interconnected traffic is governed by "reciprocal compensation" whereby incumbents and competitors pay each other for routing and terminating calls within an exchange area. *See* 47 U.S.C. § 251(b)(5); 47 C.F.R. § 51.703. By contrast, "[l]ong-distance calls (referred to variously as interstate or intrastate exchange service or toll service) are subject, in using local infrastructure, to access charges." *Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 95 (2d Cir. 2006) (citing 47 C.F.R. § 69.2(a)).

Sprint argues that it should not be subject to access charges on the interregional calls it routes through AT&T's network, even though they are undoubtedly long-distance, because they do not fit the statutory and regulatory

definition of charge-eligible traffic. Sprint Br. at 16-17. Sprint's logic is as follows. The FCC authorizes access charges on "telecommunications traffic exchanged between telecommunications providers that is interstate or intrastate exchange access." 47 C.F.R. § 51.901(b). "Exchange access," in turn, refers to "access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(20). And "[t]he term 'telephone toll service' means telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." 47 U.S.C. § 153(55). Because Sprint chooses not to impose any "extra charge" for long-distance service on its in-plan customers, Sprint concludes that the traffic in question is not "telephone toll service" and therefore cannot qualify as "exchange access" for purposes of long-distance access charges. Sprint Br. at 17.

But how Sprint chooses to bill its customers is not the linchpin on which the statutory authorization turns, and the Court instead adopts the reasoning of the Second Circuit's decision in *Global NAPs, Inc. v. Verizon New England, Inc*, which directly rejected this argument. In that case, a local exchange carrier seeking to avoid access charges put forward the same contention as Sprint here, namely, that the carrier did not impose any "separate charges" on its customers. 454 F.3d at 98. The Second Circuit explained that the carrier placed "far too much significance to the term 'separate charge,'" which was included simply as a descriptive clause "to underscore that 'tolls' applied exclusively to long-distance service" as opposed to

traditionally un-charged local calls. *Id.* Given the "sharp distinctions" the statutory regime draws between regulation of local versus long-distance calls, the Second Circuit continued, "what really mattered in determining whether an access charge was appropriate was whether a call traversed local exchanges, not how a carrier chose to bill its customers. Thus, [the carrier's] argument that since it imposes no separate fee, its traffic cannot be considered toll traffic, is beside the point." *Id.* In other words, the statutory provision defining telephone toll service turns on whether the service is "between stations in different exchange areas," 47 U.S.C. § 153(55), and the remainder of the provision merely described the then-current reality that this type of service included a separate charge. As a district court adopting the same conclusion in another case involving Sprint stated, "[t]he type of phone call, not Sprint's approach to charging its customers, controls." *Line Sys., Inc. v. Sprint Nextel Corp.*, No. CIV.A. 11-6527, 2012 WL 3024015, at *4 (E.D. Pa. July 24, 2012) (agreeing with the Second Circuit in *Global Naps, Inc.*).

This result is also consistent with the fact that within the existing regulatory framework, patchwork and work-in-progress that it might be[5], states continue to

---

[5]It bears mention that one of the underlying reasons that an issue such as this arises is the lag of the regulatory apparatus in keeping up with changes in technology and industry services. One court recently noted that "[t]he telecommunications marketplace has changed dramatically since the FCC adopted the existing intercarrier compensation regimes. For instance, most wireless services were not widely available in the 1980s, when the FCC adopted the access charge regime, and wireless services were only beginning to gain a foothold in the market in 1996." *Verizon Wireless (VAW) LLC v. Sahr*, 457 F. Supp. 2d 940, 949 (D.S.D. 2006) (citations omitted). Similarly, the notion that carriers would not charge premiums for long-distance calls, while common in today's marketplace of nationwide calling plans, may have been unforeseeable in the 1990s. It may well be that because "the FCC has expressed the desire to move away from the current patchwork of intercarrier compensation rules … to a more permanent regime that consummates the pro-competitive vision of the Telecommunications Act of 1996 and recognizes new technologies,"

have leeway in defining what constitute local calling areas and what charges should apply for long-distance traffic. *See Global NAPS*, 454 F.3d at 98. The FCC has advised that "state commissions have authority to determine whether calls passing between LECs should be subject to access charges … for those areas where the LECs' service areas do not overlap." *In the Matter of Petition of Worldcom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Va. State Corp. Comm'n Regarding Interconnection Disputes*, 17 F.C.C. Rcd. 27,039, 27,307, ¶ 549 & n.1824 (2002). The Act provides that the FCC, and by extension a reviewing federal court, "shall not preclude the enforcement of any regulation, or order, or policy of a state commission that … establishes access and interconnection obligations of local exchange carriers [and] is consistent with the requirements of this section." 47 U.S.C. § 251(d)(3). As explained above, because the ICC's determination that access charges depend on the geographic origin and endpoint of a call, and not what a carrier charges its customers, is consistent with the requirements of the Act, Sprint's request to set aside that determination must be denied.

---

*id.*, the current approach to intercarrier compensation and its focus on long-distance access charges might give way—but that will be a product of regulatory choice or statutory amendment, rather than one dictated by the current Act.

## IV. Conclusion

For the reasons stated in this Opinion, the determinations of the ICC regarding the interconnection agreement in question are affirmed. Sprint's requests for injunctive and declaratory relief are denied.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: December 1, 2014